[Crim. No. 21456. Nov. 21, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD DEAN TURNER, Defendant and Appellant.

COUNSEL

Fred Baker, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and George Deukmejian, Attorneys General, Robert H. Philibosian and Steve White, Chief Assistant Attorneys General, Daniel J. Kremer and Harley D. Mayfield, Assistant Attorneys General, A. Wells Petersen, Keith Motley, Jay M. Bloom and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUS, J.—Defendant Richard Dean Turner was convicted under the 1978 death penalty law (Pen. Code, § 190 et seq.)[1] on two counts of first degree murder. Special circumstance allegations that the murders were committed during commission of burglary (§ 190.2, subd. (a)(17)) and that Turner was convicted of more than one offense of murder (§ 190.2, subd. (a)(3)) were found to be true. The jury fixed the punishment at death. The appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) Codefendant William Souza, similarly charged and convicted, was sentenced to life imprisonment without possibility of parole.

I. FACTS

1. *Prosecution Case*

Merle and Freda Claxton, 78 and 77 years old respectively, were killed on March 8, 1979. About 9:45 p.m. on that date, the San Bernardino Sheriff's Department investigated a citizen's report that two cars were being stripped in nearby bushes. Sheriff's deputies found a Pinto station wagon and a Comet, both with lights on and doors open. On top of the vehicles, they saw a shotgun, a portable television, and a radio. Two rifles were found in one of the vehicles, and the deputies found another rifle in the bushes,[2] as well as a file cabinet, cans of paint, household goods (pots, pans, etc.), and frozen food. The cars were registered to Merle Claxton. The deputies found two wallets on the floorboard of the Comet: one had cards belonging to Merle Claxton, the other contained identification for a Richard Turner.

---

[1] Except as otherwise indicated, all statutory references are to the Penal Code.

[2] The rifles were identified as a Sears Ted Williams .22 caliber semi-automatic, a Marlin .22 caliber semi-automatic, and a Winchester 30-30 caliber lever action rifle.

Deputy Jecusco arrived at the Claxton house about 11 p.m.; all the lights were on, the front and garage doors were open, and the window to the den was smashed. As he entered, Jecusco noted a bullet hole in the front door and a .22 cartridge on the threshold. The house had been ransacked. Jecusco saw a dog lying in a pool of blood on the floor of the den. Finally, in the kitchen, he found the bodies of a man and a woman.

Deputy Hurst, a footprints expert, preserved prints in and outside the house and backtracked from the Claxton residence to a small cabin about a half mile distant. The footprints found at the cabin and those found near the two vehicles were identical. They were followed for 12 miles into the desert where the deputies came upon Turner and Souza hiding behind a bush.

Deputy Hurst handcuffed Souza and asked if he had any weapons. Souza replied, "We left them behind at the cars." At about the same time, Deputy Trumbull asked Turner where the guns were. Turner responded, "We don't have any. They were all left there when we left." The shoes worn by the suspects made prints which conformed with those observed earlier at the Claxton residence. In Souza's pockets, Hurst found a .22 caliber cartridge, a wallet with the initials FMC, and a lighter inscribed "Freda and Merle 50th anniversary, 1918-1968."

Bryan Lay, 11 years old and a neighbor of the Claxtons, recognized the newspaper pictures of Turner and Souza as two men he and a friend had met and talked with at the cabin near the Claxton residence. One of the men had identified himself as William; the other had told Bryan he used to live on Deep Creek Road.

An autopsy revealed that Merle Claxton had suffered two gunshot wounds, one to the chest that went through the heart, the other to the right side of his face near his mouth. The doctor concluded that the wound in the heart was inflicted first. Freda Claxton had suffered one gunshot wound to the back of the head. The wounds to both victims were consistent with having been caused by a .22 caliber weapon; the bullets retrieved from the victims were consistent with having been fired from the Marlin rifle.

## 2. *The Defense*

Turner did not testify and presented no evidence in his defense.

Souza testified: He met Turner at a halfway house in Stockton the month before the homicides; on the day of the murders, the two, in the company of other people, swam and drank beer ("more than a six-pack") in the Deep Creek area; he and Turner each purchased and smoked a "Sherman," de-

scribed as "like PCP"; the Sherman made them very hungry and on the way back to the cabin in which they were staying, they decided to burglarize a house for food; they decided on the Claxton house because it looked as if nobody were home and because it was not easily seen from the road.

Souza knocked while Turner, armed with a rifle, waited around the corner of the house; when the lights came on and a dog barked, Souza became frightened and ran; he ran past Turner whom he described as looking "crazy" with eyeballs "punching out of his head"; when about 50 yards from the house, he heard three gunshots; thinking his friend was in trouble, he returned just in time to see Turner's foot going into the house through a broken window; Turner let him in the front door, then ordered him to "get the stuff, get the hell out of here"; as he complied, Souza saw the victims lying on the floor; he picked up a rifle lying on the floor nearest to Merle Claxton, but not within his arm's reach.[3]

Souza testified further that he did as he was ordered because Turner was pointing the gun at him and behaving very strangely: "His eyes were still popped out of his head, more or less. His eyes were real wide, real open, you know. I don't know. It just didn't look like it was Richard. Looked like he was tripping on that PCP that we smoked." Souza also testified that it looked as though Turner had gone into "one of those wack attacks," and described the behavior as "hallucinating or something."

While in jail, Turner told Souza that he shot Merle Claxton because "he had a gun" and was about to shoot Turner; Freda Claxton was shot by accident—she jumped in front of her husband as Turner was attempting to shoot him the second time.

Souza admitted that, while in custody, he asked Turner to take responsibility for both killings. Souza was also aware that Turner told Detective Malmberg that he, Turner, was going to take the blame for both killings to take Souza off the hook.

This conversation was confirmed by Malmberg during rebuttal, when he testified to an encounter at the county jail in which Turner told him that he was going to "cop" to both murders to get his partner off the hook. Turner at no time told Malmberg that he was guilty of the murders nor did he ever say that he shot the Claxtons.

Detective Malmberg was also recalled by Turner and, on surrebuttal, testified *that no footprints were seen on the side of the house where, ac-*

---

[3]The rifle taken by Souza, the Sears Ted Williams .22 caliber rifle, was later identified as belonging to Merle Claxton who kept it in his bedroom.

cording to Souza's testimony, Turner was said to be waiting as Souza knocked on the door of the Claxton residence.

The only theory of murder advanced by the prosecution was felony murder and the jury was instructed only on that theory. The jury was instructed that malice is express when there is manifested an intent to kill and that it is implied when the killing is a direct causal result of the perpetration or attempt to perpetrate a burglary. It was also instructed that "the unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs as a result of the commission or attempt to commit the crime of burglary, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree."

The jury found both Turner and Souza guilty of two counts of first degree murder. The jury also found the charged special circumstances to be true— one, multiple murders and, two, murder committed during commission of burglary.

## II. Guilt Phase Issues

Turner raises numerous claims of error with respect to the guilt and special circumstances phase of the trial. We treat the issues in chronological order: first the pretrial issues relating to consolidation of the cases for trial and the selection of the jury; second, evidentiary rulings and other motions during the course of trial; third, alleged instructional errors; and finally, the validity of the special circumstances.

### 1. Motion to Consolidate

Turner contends that the trial court erred in consolidating his trial with that of Souza. Originally, Turner and Souza were jointly charged by complaint in municipal court. Illness of counsel resulted in separate preliminary hearings and separate accusatory pleadings. Thereafter, though technically severed, the cases proceeded through the courts together. Eventually, on motion of the People and over the objection of both defendants, they were formally consolidated for trial.

Penal Code section 1098 states the general preference for joint trials: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial, and any number of the others at different trials, or may order a sepa-

rate trial for each defendant; provided, that where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial."

■ The matter of granting separate trials nevertheless remains largely within the discretion of the trial court (*People* v. *Graham* (1969) 71 Cal.2d 303, 330 [78 Cal.Rptr. 217, 455 P.2d 153]), guided by the principles set out in *People* v. *Massie* (1967) 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869]. The court should separate the trial of codefendants "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." (*People* v. *Massie, supra,* 66 Cal.2d at p. 917, fns. omitted.)

Turner contends that the testimony offered by Souza conflicted with his defense and was gravely prejudicial to him in that it "supplemented" what, but for Souza's testimony, was a case based merely on circumstantial evidence. ■ Although what transpires at trial determines the prejudicial effect of an erroneous ruling on a motion for separate trials, "[w]hether denial of a motion to sever the trial of a defendant from that of a codefendant constitutes an abuse of discretion must be decided on the facts as they appear at the time of the hearing on the motion rather than on what subsequently develops." (*People* v. *Isenor* (1971) 17 Cal.App.3d 324, 334 [94 Cal.Rptr. 746]; see also *People* v. *Brawley* (1969) 1 Cal.3d 277, 292 [82 Cal.Rptr. 161, 461 P.2d 361]; *People* v. *Santo* (1954) 43 Cal.2d 319, 332 [273 P.2d 249].) On that note, we examine the trial court's ruling.

Potential justification for separate trials was dissipated when the prosecution assured the court that it did not intend to use extrajudicial confessions, statements, or filmed reenactments in which one defendant incriminated the other. (See *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265].) Turner's counsel then opposed joint trial on the basis of "likely confusion from evidence on multiple counts" and "conflicting defenses," citing *People* v. *Chambers* (1964) 231 Cal.App.2d 23 [41 Cal.Rptr. 551]. *Chambers* concerned the consolidation of separate charges against different defendants involving distinct and unconnected offenses. In contrast, the instant case provided the classic situation for joint trial—defendants charged with common crimes against common victims.

As to conflicting defenses, counsel could articulate no reason for separate trials except to point out that the prosecution would simply put on its case, then sit back and watch as defense counsel became the real adversaries. Of

course, if that point has merit, separate trials would appear to be mandatory in almost every case.

■ In sum, at the time of the motion to consolidate, the court was faced with two men charged with murders under circumstances in which all the events surrounding the crimes and ultimate arrests involved them jointly. We conclude that the trial court did not abuse its discretion in ordering consolidation based upon the showing made at the time of the motion. ■ After trial, of course, the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law. (*People v. Simms* (1970) 10 Cal.App.3d 299, 308-309 [89 Cal.Rptr. 1].) ■ *Simms* supports the proposition that no denial of a fair trial results from the mere fact that two defendants who are jointly tried have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution. (*Id.*, at p. 314; see also *People v. Terry* (1970) 2 Cal.3d 362, 390 [85 Cal.Rptr. 409, 466 P.2d 961].)

### 2. *Selection of Jury*

Turner raises two issues regarding the voir dire and selection of the jury. ■ He contends that (1) the People's exclusion by peremptory challenge of all persons with reservations about capital punishment denied him his constitutional right to a jury chosen from a representative cross-section of the community, and (2) the trial court erred in failing to order *in camera* examination of jurors.

#### a. *Exclusion of Jurors by Peremptory Challenge*

In *People v. Wheeler* (1978) 22 Cal.3d 258, [148 Cal.Rptr. 890, 583 P.2d 748], on which Turner relies, we held that the prosecution may not systematically use peremptory challenges for the sole purpose of excluding members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. The prosecutor in *Wheeler* peremptorily challenged every black juror in the trial of a black defendant. Reversing the judgment of conviction, we concluded that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." (22 Cal.3d at pp. 276-277.)

Representational cross-sectional analysis developed as a response to pernicious practices of eliminating identifiable groups from the jury pool, thus preventing their consideration as petit jurors. (E.g., *Duren v. Missouri*

(1979) 439 U.S. 357, 364-368 [58 L.Ed.2d 579, 586-589, 99 S.Ct. 664] [women]; *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]; *Peters* v. *Kiff* (1972) 407 U.S. 493, 503-504 [33 L.Ed.2d 83, 94, 92 S.Ct. 2163] [blacks]; *Ballard* v. *United States* (1946) 329 U.S. 187, 193-194 [91 L.Ed 181, 185-186, 67 S.Ct. 261] [women]; *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1184, 66 S.Ct. 984, 166 A.L.R. 1412] [wage earners]; *Glasser* v. *United States* (1942) 315 U.S. 60, 84-85 [86 L.Ed. 680, 706-707, 62 S.Ct. 457] [women not members of League of Women Voters]; *People* v. *White* (1954) 43 Cal.2d 740, 748 [278 P.2d 9] [blue-collar workers].) Petit juries selected from these pools were deprived at the outset of the spectrum of attitudes and beliefs shared by members of the excluded groups. Their unrepresentative nature was preordained, and the countervailing state interests advanced were generally insubstantial.

In *Wheeler,* we recognized that a "representative" jury could sometimes be denied even though the jury pool was fairly composed. Thus, systematic exclusion of black persons during the petit jury selection process tended to eliminate the entire spectrum of attitudes they had developed from experiences as members of that group. (22 Cal.3d 258, 276.) Manifestly, no legitimate state interest could be served by permitting the government's attorney to employ racism in the conduct of a trial.

■ On the other hand, peremptory challenges are a historic right, provided "to insure that criminal trials are conducted before jurors who not only proclaim their impartiality, but whose ability to be evenhanded is not seriously questioned by *the parties.* . . ." (*People* v. *Williams* (1981) 29 Cal.3d 392, 401-407 [174 Cal.Rptr. 317, 628 P.2d 869], italics added.) For that reason, we recently overruled the longstanding doctrine that voir dire must be limited to questions reasonably calculated to discover challenges for cause. (*Id.,* at p. 407, overruling *People* v. *Edwards* (1912) 163 Cal. 752, 753 [127 P. 58].) If jurors who "proclaim their impartiality" may be eliminated on the basis of counsel's contrary suspicions, *a fortiori* a juror who openly professes a leaning or strong opinion on an issue presented by the pending trial may be excluded.

*Wheeler* supports that view. It affirmed that "the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality," however "trivial" or "speculative," and even if based on " 'sudden impressions and unaccountable prejudices' . . ." (22 Cal.3d 258, 275, quoting 4 Blackstone, Commentaries *353). For example, said *Wheeler,* a prospective juror may be excluded, regardless of his or her group identification, if counsel believes he or she "evince[s] an ex-

cessive respect for authority" or "believe[s] strongly in law and order." (*Id.*, at pp. 275-276.)

Thus *Wheeler* merely condemned the use of peremptory challenges to indulge so-called "group bias"—the *presumption* that persons are biased "because they are members of an identifiable group distinguished on *racial, religious, ethnic, or similar* grounds. . . ." (*Id.*, at p. 276, italics added.) ▉ But it affirmed that the right remained to eliminate a "specific bias . . . relating to the particular case on trial," even if it does not warrant a challenge for cause.

Moreover, we see no other constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty. While a statute requiring exclusion of all jurors with any feeling against the death penalty produces a jury biased in favor of death (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 520-521 [20 L.Ed.2d 776, 784, 88 S.Ct. 1770]), we have no proof that a similar bias arises, on either guilt or penalty issues, when *both parties* are allowed to exercise their equal, limited numbers of peremptory challenges—26 apiece in this capital case (§ 1070, subd. (a))—against jurors harboring specific attitudes they reasonably believe unfavorable. (Cf. *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 26 et seq. [168 Cal.Rptr. 128, 616 P.2d 1301].)

We recognize that a jury shorn of significant community viewpoints on an issue in the case is not ideally suited to the "purpose and functioning of a jury in a criminal trial." (*Ballew* v. *Georgia* (1978) 435 U.S. 223, 239 [55 L.Ed.2d 234, 246, 98 S.Ct. 1029].) That, however, is a result inherent in the parties' historic and important right to exclude a limited number of jurors for fear of bias. We conclude, therefore, that Turner's objection to the use of peremptory challenges in this case must fail.

b. *Examination of Prospective Jurors In Camera*

Turner argues that the trial court should have ordered *in camera* examination of jurors throughout the jury selection process. Counsel for Souza moved for such sequestered examination of jurors. Turner's counsel opposed the motion; the trial court denied it. After examining some of the jurors in the presence of each other, the court expressed concern that they seemed reluctant to express their views; it then reexamined some of them *in camera*. After the empaneling of 12 jurors, during the selection of alternate jurors, the court agreed to question the remaining prospective jurors *in camera*. Both defense counsel then moved for a mistrial based on the denial of Souza's original motion for a sequestered examination. The motion was denied.

■ This case was tried before our decision in *Hovey* v. *Superior Court, supra,* 28 Cal.3d 1, requiring that "in future capital cases" voir dire on death qualification should be done "individually and in sequestration." (*Id.,* at p. 80.) The clear expression of prospectivity of the rule announced in *Hovey* is controlling.[4]

### 3. *Evidentiary Rulings*

Turner assigns error in the admission of statements made at the time of arrest and statements during his conversation with Detective Malmberg while in jail. He also complains that four photographs were improperly presented to the jury.

### a. *Statements Made at Time of Arrest*

■ As noted, the tracking party discovered Turner and Souza some distance from the scene of the crime and the location of the stolen vehicles. The suspects were told to "freeze" and ordered to lie face down. During the handcuffing and pat-down for weapons, Souza was asked if he had any weapons and replied, "We left them back at the car." Turner was asked where the weapons were and responded, "We don't have any. They were all left there when we left."

Turner moved pretrial to suppress his statements on *Miranda* grounds, i.e., that the officers' inquiries were custodial interrogation and should have been preceded by *Miranda* warnings. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The trial court denied the motion and admitted the statements, concluding that the testimony of the officers, as well as the circumstances surrounding the incident, established that the question was asked to insure the deputies' safety and was not "interrogation designed to elicit incriminating statements."

The *Miranda* decision contains no limitation requiring that the questioning be designed to "elicit incriminating statements." ■ The *Miranda* test was clearly stated: ". . . [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean *questioning initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. at p. 444 [16 L.Ed.2d at p. 706], italics added.)

---

[4]We need not decide what effect, if any, the decision in *Press-Enterprise Co.* v. *Superior Court of Cal.* (1984) 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819] will have on *Hovey.*

In *Rhode Island* v. *Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682], the court addressed the precise meaning of "interrogation" under *Miranda,* repeated the definition contained in that decision—*"questioning initiated by law enforcement officers"*—and concluded that the *Miranda* rules applied not only to police practices "that involve express questioning of a defendant while in custody," but also to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (446 U.S. at pp. 298, 301 [64 L.Ed.2d at pp. 306, 308], fns. omitted.) Thus, *Innis* broadened, rather than narrowed, the definition of "interrogation" as employed in *Miranda.* Certainly the decision did not dispute the implication in *Miranda* that questioning is always likely to elicit a response, incriminating or not, from a suspect in custody.

In ruling that the statements were admissible, the trial court relied on *People* v. *Superior Court (Mahle)* (1970) 3 Cal.App.3d 476 [83 Cal.Rptr. 771]. In *Mahle,* officers arrived at the scene of a stabbing and asked defendant, "What happened?" Defendant said, "I did it and I'm sorry." When the defendant was arrested and handcuffed, an officer asked, "Where is the knife?" Defendant replied, "Over on the kitchen sink." The Court of Appeal found no violation of *Miranda* and ruled the knife admissible. The court reasoned that the first inquiry, "What happened?" was purely investigatory and that the second inquiry, immediately following the first inquiry and arrest of defendant, "appears to be part of the investigatory process initiated by the first question, rather than the undertaking of a process of interrogation having for its purpose the eliciting of incriminating statements. . . ." (*Id.,* at p. 489.)

The trial court in this case also relied on *People* v. *Sanchez* (1967) 65 Cal.2d 814, 822-824 [56 Cal.Rptr. 648, 423 P.2d 800], vacated and reiterated in relevant part in *People* v. *Sanchez* (1969) 70 Cal.2d 562, 577 [75 Cal.Rptr. 642, 451 P.2d 74], in which at the scene of another stabbing, an officer arrived and asked, "Who did this?" When defendant, bloodied and with knife in hand, was pointed out, the officer asked, "Why did you do it?" We held defendant's response admissible, concluding that the episode embraced "an almost miniscule time period," occurring immediately after the officer arrived, and that the "primary, if not sole, concern" was apprehension rather than interrogation.

The trial in *Sanchez,* however, occurred before *Miranda*; the applicable standard was provided by *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]: An extrajudicial statement was inadmis-

sible when "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (*Dorado, supra,* 62 Cal.2d at pp. 353-354.) Until the decision in *Miranda,* it could be argued—and was—that "certain kinds of questioning of a suspect for the purpose of giving him a chance to explain incriminating circumstances were said not to be 'a process of interrogations that lent itself to eliciting incriminating statements.'" (*People* v. *Woodberry* (1968) 265 Cal.App.2d 351, 355 [71 Cal.Rptr. 165]; see also *People* v. *Stewart* (1965) 62 Cal.2d 571, 578 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Cotter* (1965) 63 Cal.2d 386, 395 [46 Cal.Rptr. 622, 405 P.2d 862], vacated on other grounds *sub nom. Cotter* v. *California* (1967) 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035], app. dism. by consent June 14, 1967; *People* v. *Sanchez, supra,* 65 Cal.2d 814, 824.)

After *Miranda,* however, no fine distinction can be made as to the officer's intention when a suspect is subjected to *express questioning.* As stated in *Rhode Island* v. *Innis, supra,* 446 U.S. at page 301 [64 L.Ed.2d at page 308], ". . . *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." Under the dictates of *Miranda,* the officer's question in *Sanchez*—"Why did you do it?"—would have resulted in an inadmissible statement.

In both *Sanchez* and *Mahle,* the officers came onto the scene of the crime with no information concerning the crime or its perpetrators. Therefore it is quite true that the initial question in each instance was investigatory. "What happened?" and "Who did this?" were questions directed to all persons who were present. Stated another way, the investigations were still "general inquiries" and had not focused on a particular suspect (*People* v. *Dorado, supra,* 62 Cal.2d at pp. 353-354) and the suspects were not yet "in custody" (*Miranda, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706]). At the time of the second questions—"Where is the knife?" and "Why did you do it?"—however, the investigation in both *Sanchez* and *Mahle* had focused on a particular individual and, in neither case, was the suspect free to leave. Warnings should have preceded the interrogation in *Mahle* and insofar as that opinion is inconsistent with the views expressed herein, it is disapproved.[5]

---

[5]As noted above, *Sanchez* was decided under pre-*Miranda* standards.

 We come then to this case. When the officers came upon Souza and Turner in the desert, they had discovered the victims of the crimes, they had found evidence to incriminate the persons whose shoeprints conformed to those at the Claxton residence, at the location of the vehicles, and for 12 miles into the desert. The officers engaged in no "general inquiry" about the murders. With drawn guns, they apprehended the two suspects, handcuffed, and otherwise immobilized them. There appears to be no question that they were "in custody" when the officers questioned them.

While the trial court erred in admitting Turner's statements to the arresting officer, their admission could not have affected the verdict. What proved to be the murder weapon had already been found, as well as other guns in the possession of Turner and Souza in the period just before and after the crime. Turner's admission that he and his companion had left the weapons at the location of the stolen vehicles served to connect him with the murder, but other, overwhelming circumstantial evidence—even aside from Souza's testimony—also connected him with the deaths of the Claxtons. The prosecution introduced fingerprint and ballistic evidence as to the guns themselves, Turner's identification papers were found at the location of the weapons, footprints which proved Turner's and Souza's presence at the Claxton home, testimony of a youth who placed Turner and Souza at the cabin at the crucial time and, finally, the possession by Turner and Souza of the personal items of the Claxtons. Turner's statements to the arresting officer, which tended to establish guilt only when considered with the remaining evidence in the case, pale in significance when so considered. We can say with confidence that the introduction of the statements was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see also *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].)

b. *Statement to Detective Malmberg in Jail*

In September 1979, while Detective Malmberg was at the jail on an unrelated matter, he was approached by Turner who started a conversation during which he stated that he was going to "cop" to both charges in order to get his partner off the hook. Malmberg advised Turner on the applicable law and told him to discuss the matter with his counsel. Turner at no time told Malmberg that he was guilty of both the murders or that he shot anyone. Malmberg's testimony on the conversation was not introduced until the rebuttal phase of trial.

At no time did trial counsel object to the introduction of the evidence. Indeed, at the pretrial hearing on the question of joint trials, when *Aranda* (*People* v. *Aranda, supra,* 63 Cal.2d 518) problems were being discussed

and the prosecutor indicated she intended to use the statement, trial counsel stated he had no objection because it was "a spontaneous statement" which was not elicited by the police. Later, just before Souza took the stand, when it appeared that Souza might call Malmberg, counsel for Turner again indicated that he considered it a "voluntary statement."

Now Turner argues for the first time that Malmberg "exploited" a relationship which existed between them as the result of an interrogation that had occurred six months earlier.[6] The assertion is devoid of support in the record which, insofar as it reveals the circumstances under which the statement was made, establishes that it was entirely voluntary and uninfluenced by the interrogation of six months before. ██ Neither *Fioritto* nor *Miranda* preclude use of statements voluntarily uttered by a defendant in a discussion initiated by him.

For the above reasons, we find no error. Besides, the introduction of the statement was undoubtedly harmless.

### c. *Admission of Photographs*

██ Turner contends the trial court erred in admitting four photographs of the crime scene, depicting the bodies of the Claxtons and the dog.[7] It is not urged that the photographs are gruesome or inflammatory—the usual complaint—but that they are more prejudicial than probative because they are unnecessary to prove any part of the prosecution's case.

One photograph depicts the relative position of the bodies. Another depicts Mrs. Claxton alone. There is no visible wound; her head is resting in a large pool of drying blood—she was shot at the base of the skull. A third photograph depicts Mr. Claxton lying face up with bleeding wounds in his chest and one in his right cheek.

Relying on *People* v. *Boyd* (1979) 95 Cal.App.3d 577 [157 Cal.Rptr. 293], Turner asserts that it was error to admit these photographs because the prosecution based its case on felony murder.[8] As such, the only issue

---

[6]In March 1979, following his arrest, Turner made certain statements to Malmberg which were suppressed at the preliminary hearing on *Miranda* and *Fioritto* (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625]) grounds.

[7]He also challenges the admission of two photographs of the Claxtons taken a year earlier, but made no objection to their admission at trial.

[8]In *Boyd*, the court held that photographs of the victim had little, if any, probative value on the issues of malice, intent, or the degree of the offense since the prosecution was pursuing a felony-murder theory. The prosecution had argued that the photographs were relevant on the issue of whether the victim died as a result of a beating inflicted by someone other than the defendant. The court held that because the photographs could shed no light on when the beating occurred or by whom, their probative value was outweighed by the prejudicial effect on the jury.

was whether Turner committed burglary, i.e., whether he entered the house with felonious intent. The probative value of the photographs, it is urged, could go only to the intent to kill, a nonissue. We agree.

The prosecution's stated purpose in submitting the photographs was to show the relative position of the bodies. The trial court ruled that one of the photographs was admissible on that basis while two others showed how the wounds were inflicted.[9] Neither the court nor the prosecution articulated the relevance of the position of the bodies or the manner of the infliction of the wounds to the issues presented. Nor can the admission of the photographs be supported on the Attorney General's theory—raised for the first time on appeal—that they serve to rebut a claim of self-defense. Though later hinted at in Souza's testimony, that defense was never in issue.

Although the admissibility of photographs lies primarily in the discretion of the trial court (*People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 302-303 [168 Cal.Rptr. 603, 618 P.2d 149]), it has no discretion to admit irrelevant evidence. (Evid. Code, § 350.) Nevertheless, as the photographs are not gruesome and the evidence of guilt overwhelming, any error in admitting them was harmless.

### 4. *Motion for Recess and for Appointment of Experts*

Turner asserts that the trial court abused its discretion in denying a motion for a recess and appointment of an expert. An understanding of the time and circumstances in which these motions were made is crucial: Turner presented no evidence in his defense and rested. Souza took the stand on December 4, 1979, and testified, inter alia, that during the afternoon which preceded the killings he and Turner had each smoked a cigarette laced with PCP. He also testified that after the killings Turner appeared to be suffering a "wack attack," to be "tripping on the PCP stuff we smoked."

On the day following Souza's testimony, during a discussion of instructions on diminished capacity,[10] counsel for Souza indicated that he had known from the time of the preliminary hearing that his client had ingested "some type of hallucinogenic" but had, as a matter of trial strategy, rejected

---

[9]The court stated: ". . . They are far from gruesome in the usual sense. They are very mild. They, of course, show blood and wounds on the part of Mr. Claxton and same goes for the dog. . . . I think each has a different significance. Photograph No. 10 shows, without showing any details of the wounds or anything of that nature, shows the relative position of the bodies quite well. The other two are not adequate to show the relative positions of the bodies but do show how the wounds or to some extent how the wounds were inflicted."

[10]Both counsel indicated that they intended to seek diminished capacity instructions.

a possible diminished capacity defense in favor of the defense pursued (i.e., change of heart before burglary attempted), which he viewed as inconsistent with diminished capacity.

Counsel for Turner indicated that, after hearing Souza's testimony, he too was prepared to offer diminished capacity instructions and felt that, in any event, in view of the evidence, the court would probably have to give them *sua sponte*. The court then speculated whether defense counsel can ever, under *Frierson, supra,* 25 Cal.3d 142, select one defense and not investigate another, possibly inconsistent one, without subjecting himself to charges of incompetency. The court also speculated as to its own responsibility in the matter. It was in response to those comments that counsel for Turner (1) moved for a mistrial, and (2) moved for a recess "so that [he could] fully investigate and have an expert appointed to explore the defense of diminished capacity as it relates to the smoking of the Shermans." When the prosecution pointed out that counsel for Turner had not put on any testimony and was merely "spinning off" Souza's testimony, counsel responded, "That's true. I became aware of Mr. Souza's testimony when he testified." The prosecution then moved to have the defendants available for examination by a prosecution expert.

The trial court denied all the motions. As to Turner's motion, the court reasoned: ". . . I perceive that if Mr. Turner had consumed some hallucinogenic substance in all candor he would have told [defense counsel] that he didn't know what he was doing, that he was under the influence of something called Shermans, and [counsel's] trial strategy quite probably would have been very different. It wasn't until Mr. Souza announced from the stand that Mr. Turner had consumed Shermans that [counsel] had heard that concept. It was not a defense that Mr. Turner in his candid discussions with [counsel] had made available to [him] . . . ."

The court's ruling was obviously based upon an understandable misunderstanding of the remarks of Turner's counsel concerning Souza's testimony. Counsel did not state that he was unaware of his client's use of PCP prior to the crime, only that he was unaware that Souza would testify to the drug use. In fact, two doctors, both of whom later, during the penalty phase, described themselves as experts in the area of PCP usage, had examined Turner, at defense counsel's request, before Souza testified.[11] The record does not disclose, however, when they reported their findings to counsel. Thus, counsel may have been aware that Turner used PCP prior to the crime but, as a matter of trial strategy and tactics, had decided to forego a dimin-

---

[11] We leave aside the question whether defense counsel was not under some obligation to advise the court that its ruling was based on a mistake of fact.

ished capacity defense and to rest his case on the prospect that the People's case, based entirely on circumstantial evidence, would fail the reasonable doubt test.

Under the dictates of *Frierson* and in the interest of his client, however, counsel was not only entitled, but obligated, to reassess and change the strategy and tactics during the trial, and in some circumstances the frustration of counsel's efforts in this regard could constitute an abuse of discretion.

 In ruling on a motion for a recess—or continuance—in the midst of trial, the judge "must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for continuance cannot result in a reversal of a judgment of conviction." (*People* v. *Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145].)

 Whether any error with respect to the motion for a recess warrants a reversal of the judgment, therefore, requires an assessment of the prejudice to Turner from the court's ruling. As noted, two doctors had already been appointed for the defense and had examined Turner; if counsel did not yet have their reports, a minimum of effort would have secured a report of their evaluation of Turner's mental state at the time of the crime. We must assume that, upon a proper showing, the trial court would have permitted the reopening of Turner's case to present the defense of diminished capacity.

The record reveals, however, that the doctors' conclusions as to the effect of the drug on Turner did not portend a viable diminished capacity defense. They testified at the penalty phase that Turner told them of using PCP before the crime. Both described Turner as having a "schizoid personality"; Dr. Chapman, a psychiatrist, stated that, although Turner may have been partially intoxicated from his usage of PCP, he was in contact with reality, had the mental capacity to commit burglary, and had planned the burglary and committed it with knowing intent. Dr. Conrad, a psychologist, engaged to conduct a battery of psychological tests on Turner, made no attempt to determine his mental state at the time of the crime, but testified that Turner

told him he intended to commit burglary when he approached the Claxton residence.[12]

Counsel thus had access to the testimony of two experts; that their testimony would or might be less than favorable to the defense did not entitle counsel to seek a third, perhaps more favorable opinion. Based on the entire record, therefore, and considering what the penalty phase revealed as to the viability of a diminished capacity defense, we reach the obvious conclusion that Turner suffered no prejudice in the denial of the motion to recess the trial.

## 5. *Instructional Errors*

Turner assigns three errors in the instructions to the jury at the guilt phase: (1) that the court failed to instruct on diminished capacity; (2) that the court instructed on first degree murder as a matter of law; and (3) that the court instructed on felony murder.

### a. *Instructions on Diminished Capacity*

Turner contends that the trial court erred in refusing to give requested instructions on diminished capacity. (CALJIC Nos. 8.77 and 8.79.)[13] He argues that such instructions might have prevented the jury from finding him guilty of murder under the felony-murder doctrine, i.e., the jury might have found that he could not form the specific intent to commit burglary.

The trial court must instruct on diminished capacity whenever there is substantial evidence presented that would negate the requisite crim-

---

[12]Dr. Conrad was asked, "Did he [Turner] tell you that they approached the house with the intent to commit the crime of burglary?" and responded, "Yes." When the prosecutor inquired whether Turner told him that it was a "predetermined plan that they'd talked about?" Conrad responded, "I had the impression that it was a predetermined plan. I don't remember him telling me in the exact words, but, yes; I have the impression."

[13]CALJIC No. 8.77 reads: "Furthermore, if you find that as a result of mental illness, mental defect, or intoxication, his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter."

CALJIC No. 8.79 reads: "Before the defendant may be found guilty of the unlawful killing of a human being as a result of the commission or attempt to commit the crime of _____, you must take all the evidence into consideration and determine therefrom if, at the time of the commission or attempt to commit such crime, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent to commit such crime. [¶] If from all the evidence you have a reasonable doubt whether the defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent."

inal intent. (*People* v. *Harris* (1981) 28 Cal.3d 935, 957 [171 Cal.Rptr. 679, 623 P.2d 240]; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Frierson, supra,* 25 Cal.3d 142, 155-156.)

At the guilt phase the only testimony as to Turner's mental state at the time of the crime was presented by codefendant Souza. We reexamine that testimony in more detail: on the day of the murders Turner and Souza went to Deep Creek where they swam, drank a six-pack of beer, and smoked two Shermans (cigarettes laced with PCP) between them. Afterwards, they "floated" around for awhile on a motorcycle they had stolen. At about 6 p.m. they got hungry. The motorcycle had broken down and was abandoned. They started to walk back to their cabin, speculated that the Shermans had made them hungry, and began to talk about "ripping off" food. At about that time they were passing the Claxton house and decided that Souza would knock on the door while Turner waited outside with a rifle. When the occupant responded, Souza panicked and ran. As he passed Turner, he urged him to leave also, noting that Turner's eyes "seemed to be punching out of his head." After hearing shots, Souza returned to the house. He described Turner's appearance: "His eyes were real wide, real open, you know . . . it just didn't look like it was Richard. Looked like he was tripping on that PCP that we smoked."

On cross-examination, Souza testified that they were "sort of high" as they walked toward their cabin from Deep Creek, but he did not notice the look in Turner's eyes until after the shootings: "I thought he went into like one of those wack attacks that I heard about . . . . It seemed like he was hallucinating or something, put it that way." Souza admitted that Turner seemed not at all unusual on the walk from Deep Creek before they reached the Claxton house—"I thought he was just regular old Turner."

As noted, discussions concerning the propriety of diminished capacity instructions were interspersed with discussions on counsel's motion for a recess. At that time the court made it clear that it found the evidence insufficient for diminished capacity instructions: "Mr. Souza was explicit that Mr. Turner showed no sign of wack attack until after Mr. Souza had seen the bodies in the kitchen. That was the first evidence, according to Mr. Souza, that Mr. Turner had lost possession of his faculties or was in any other way disabled in his cognitive ability."

Later, the court summarily denied the requested diminished capacity instructions, obviously on the theory that *at the time of entry*—the crucial period for assessment of the requisite criminal intent for burglary—Turner

was "just regular old Turner," with no evident effects from the ingestion of PCP.

We found no substantial evidence of intoxication to merit the jury's consideration in *People* v. *Flannel, supra,* 25 Cal.3d 668, where the defendant had consumed relatively small amounts of alcohol over a long period of time (a shot or two of gin at 10 a.m.; a couple of beers and a shot of whiskey between 2:30 and 4 p.m.), where the arresting officer recalled nothing indicating defendant was under the influence, and defendant's testimony about his intoxication was equivocal.

In *Frierson* we found the evidence of defendant's diminished capacity, as it pertained to the specific intent required for robbery, was too insubstantial to warrant *sua sponte* instructions on the subject: There was "no evidence whatever, expert or otherwise, regarding the intoxicating effect, if any, which his use of undetermined amounts of Quaalude and angel dust may have had upon his ability to form the necessary intent to rob or kill." (*Frierson, supra,* 25 Cal.3d at p. 156.)

We also concluded the evidence of diminished capacity was insubstantial in *People* v. *Harris, supra,* 28 Cal.3d 935. An officer testified that, while confessing to the murder, defendant told him, " 'I was pretty loaded and I didn't know what I was doing. I had smoked two joints [marijuana] before this came down . . . I didn't know what I was doing.' " (*Id.,* at p. 958.) There was no indication how soon before the murder he smoked the marijuana, nor was there any expert testimony on the effect that amount of marijuana would have on a person such as defendant.

■ Comparing the evidence of drug use and intoxication in this case with the cases in which we have held the evidence too insubstantial to support instructions on diminished capacity, the conclusion is inescapable that here too the evidence did not merit the jury's consideration. We must remember that it is not Turner's capacity to deliberate, premeditate or harbor malice that is at issue: for our purposes, his precise state of mind concerning the killings is irrelevant. We are only interested in whether at the time he entered the residence he had the capacity to intend to steal.

The amount of drug use is stated: the codefendants split, more or less, a six-pack of beer and each smoked a "Sherman." Souza described Turner's demeanor at the time of entry into the residence. Even if some of the changes in Turner's demeanor were apparent to Souza before Turner en-

tered the house,[14] none of the evidence suggests diminished capacity to harbor the simple intent to enter a residence to commit theft. Turner and Souza rationally discussed their hunger and the possibility of stealing food and made a conscious decision to choose the Claxton residence because it was set back from the road.

The trial court properly rejected the requested instructions on diminished capacity.

### b. *Instruction on First Degree Murder as Matter of Law*

The court instructed: "If you should find the defendant guilty of murder, you are instructed that it is murder of the first degree." On the evidence before the court, the instruction was entirely warranted. ▉ When the evidence points indisputedly to a homicide committed in the course of a felony listed in section 189 of the Penal Code, the court is justified in advising the jury that the defendant is either innocent or guilty of first degree murder. (*People* v. *Lessard* (1962) 58 Cal.2d 447, 452 [25 Cal.Rptr. 78, 375 P.2d 46]; *People* v. *Turville* (1959) 51 Cal.2d 620, 631 [335 P.2d 678]; *People* v. *Riser* (1956) 47 Cal.2d 566, 581 [305 P.2d 1]; see also *People* v. *Beivelman* (1968) 70 Cal.2d 60, 73-74 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Mabry* (1969) 71 Cal.2d 430, 438 [78 Cal.Rptr. 655, 455 P.2d 759]; *People* v. *Duren* (1973) 9 Cal.3d 218, 236-237 [107 Cal.Rptr. 157, 507 P.2d 1365]; *People* v. *Day* (1981) 117 Cal.App.3d 932, 936 [173 Cal.Rptr. 9].)

### c. *Instruction on Felony Murder*

Turner invites us to reexamine the felony-murder rule in California. ▉ We did so in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] and upheld the rule: "After reviewing its legislative history we find that in California the rule is a creature of statute, and hence cannot be judicially abrogated. We also reject various constitutional challenges to the rule; we hold primarily that the rule does not deny due process of law by relieving the prosecution of the burden of proving malice, because malice is not an element of the crime of felony murder." (34 Cal.3d at p. 450.)

---

[14]Souza's testimony was ambiguous (see *ante,* p. 310). Although he first described Turner as "looking crazy" before entering the house, on cross-examination Souza stated that he first noticed the "strange" look in Turner's eyes while the two were in the house. It was only after Souza "went into the house and found the bodies" that he noticed that Turner was "hallucinating or something"—". . . I think I thought that he went into like one of those wack attacks that I heard about."

## III. SPECIAL CIRCUMSTANCES

### 1. *Felony-Murder Special Circumstances* (§ *190.2, subd. (a)(17).*)

 Both counts charging Turner with murder of the Claxtons alleged as a special circumstance that the murder was committed while he was engaged, or was an accomplice, in the commission of burglary (§ 190.2, subd. (a)(17)). In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we concluded that paragraph (17) of subdivision (a)—the felony-murder special circumstance—should be construed to require an intent to kill or to aid in a killing. The *Carlos* holding is retroactive and applicable here. (See *People* v. *Garcia* (1984) 36 Cal.3d 539, 547-549 [205 Cal.Rptr. 265, 684 P.2d 826].)

The jury was not instructed that the felony-murder special circumstances required an intent to kill or to aid in a killing. Neither the verdict on guilt nor the other special circumstance implies a finding on intent. The prosecution sought to prove only that the killing of the Claxtons occurred during a burglary; it emphasized in closing argument that it was immaterial whether Souza or Turner did the actual killings. Thus, the intentions of the perpetrator or perpetrators were not explored.

We cannot speculate as to what defenses might have been presented if the intentions of the perpetrator at the time of the killings had been relevant. Defenses of diminished capacity and self-defense, alluded to in Souza's testimony, were not developed. There may have been no evidence to support these or other defenses which go to mitigation of the intent to kill, but we cannot assume on this record that none exists.

Under the prejudicial error standard set forth in *Garcia* (36 Cal.3d at pp. 554-557), it is obvious that in this case the failure to instruct on the element of intent to kill was prejudicial. The felony-murder special circumstances must, therefore, be set aside.

### 2. *Multiple Murder Special Circumstances* (§ *190.2, subd. (a)(3).*)

The jury found a third special circumstance to be true—that Turner had "in this proceeding been convicted of more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).) The question is whether two first degree felony-murder convictions, neither of which alone can justify imposition of the death penalty absent a finding of intent to kill, can together open the door to a death penalty hearing.

In reaching the conclusion that an intent to kill is an essential element of the felony-murder special circumstance, *Carlos* relied on the history of the initiative and its wording: "The adoption of a law to permit infliction of the death penalty upon an accidental killing would be a momentous step, raising grave moral questions. Nothing in the ballot arguments suggested that the framers intended to take such a step; certainly nothing communicated any such intention to the voters." (*Carlos, supra,* 35 Cal.3d at p. 145.) The point is equally valid where there are two victims.

The best evidence of the framers' intent was found in subdivision (b) of section 190.2 which provides that "[e]very person whether or not the actual killer found guilty of intentionally aiding . . . in the commission of murder in the first degree" shall suffer death or life imprisonment without parole. The proponents of the initiative relied on this subdivision for their claim that an accomplice would face the death penalty only if he intentionally aided a killing.

As pointed out in *Carlos,* the subdivision is equally applicable to the " 'actual killer.' " (*Id.,* at p. 145.) Neither is it limited to the felony-murder special circumstance (subd. (a)(17)) at issue in *Carlos.* By its terms, the subdivision has equal application to subdivision (a), paragraph (3), the multiple murder special circumstance at issue here.[15]

*Carlos* is helpful in other respects in our analysis and interpretation of the multiple murder special circumstance. *Carlos* noted that substantial constitutional questions are posed by a statute that imposes the death penalty for an unintentional killing: "A statute which threatens to impose the death penalty, or life without possibility of parole, upon a defendant who did not intend to kill, while permitting some deliberate killers to escape with lesser punishment, might on its face violate the cruel and unusual punishment or equal protection clauses." (*Carlos, supra,* 35 Cal.3d at p. 136.) Again, no different analysis is required because two persons instead of one were unintentionally killed.

Inasmuch as the three special circumstances findings must be vacated, the punishment of death cannot stand. We therefore need not reach Turner's claims of error relating to the penalty phase of the trial.

---

[15]Section 190.2, subdivision (b) provides: "Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true."

## DISPOSITION

The findings of special circumstances are set aside and the judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

Broussard, J., and Grodin, J., concurred.

**BIRD, C. J.**— ██ ██ ██ ██ ██ ██ ██ ██ ██
 I concur in the reversal of the special circumstance findings and death sentence, but respectfully dissent from that portion of the plurality opinion that permits the prosecution to utilize peremptory challenges to remove from a jury all persons who express mere doubts about or opposition to the death penalty. Freed from the analytic fog that shrouds the discussion of this issue, the plurality's bottom-line holding is that the state is authorized to use peremptory challenges to obtain a sentencing jury which is, as the United State Supreme Court has explicitly held, a "hanging jury" and "a tribunal organized to return a verdict of death." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521, 523 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770].)

However, a hanging jury is not the only unfortunate consequence of the plurality's resolution of this issue. Another foreseeable effect is to reduce substantially the number of blacks and women serving on juries in capital cases. A sentencing jury in a capital case is supposed to "express the conscience of the community on the ultimate question of life or death." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) A jury systematically culled of blacks and women simply cannot "speak for the community" on the question as to whether death is warranted. (See *id.,* at p. 520, fn. omitted [20 L.Ed.2d at pp. 783-784].) The underrepresentation of these important segments of the community undermines the legitimacy and reliability of any death verdict reached by such a jury.

### I.

Prior to 1968, prospective jurors who expressed any doubts about or conscientious scruples against capital punishment were excluded for cause from serving on juries in death penalty cases.[1] Under this system, a jury selected

---

[1]This was the law in most jurisdictions which authorized capital punishment. (See Meltsner, Cruel and Unusual (1973) p. 118. See also, e.g., *People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Hoyt* (1942) 20 Cal.2d 306, 318 [125 P.2d 29]; cf. *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900]. See also, e.g., *Witherspoon* v. *Illinois, supra,* 391 U.S. at pp. 512-513 and fn. 5 [20 L.Ed.2d at p. 779]; *Logan* v. *United States* (1892) 144 U.S. 263, 298 [36 L.Ed. 429, 441, 12 S.Ct. 617].)

In California, and in at least a few other jurisdictions, some death penalty *supporters* were excused for cause, if they would never consider a sentence short of death. (See *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 20, fn. 48; p. 21, fn. 49; p. 63; p. 65, fn. 112 [168 Cal.Rptr. 128, 616 P.2d 1301].)

to decide whether a convicted person should live or die was composed exclusively of people who favored the death penalty or were indifferent towards it.[2]

In 1968, the United States Supreme Court determined that a sentencing jury empanelled under this system "fell woefully short of that impartiality to which [a capital defendant is] entitled under the Sixth and Fourteenth Amendments." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 518 [20 L.Ed.2d at p. 783].) Such a jury was found to be a "hanging jury," a "jury uncommonly willing to condemn a man to die," and a "tribunal organized to return a verdict of death." (*Id.,* at pp. 521, 523 [20 L.Ed.2d at pp. 784-785].) "[W]hen it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality." (*Id.,* at p. 520 [20 L.Ed.2d at p. 784].) It "stacked the deck" against the accused and "necessarily undermined 'the very integrity of the . . . process' that decided [his] fate . . . ." (*Id.,* at p. 523 and fn. 22 [20 L.Ed.2d at p. 785], quoting from *Linkletter* v. *Walker* (1965) 381 U.S. 618, 639 [14 L.Ed.2d 601, 614, 85 S.Ct. 1731].) The result was a violation of the "basic requirements of procedural fairness." (391 U.S. at p. 521, fn. 20 [20 L.Ed.2d at p. 784].)

The court based its conclusion on the role played by the jury at a capital sentencing proceeding. One of the most important functions of a sentencing jury, the court stated, is to "maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" (391 U.S. at p. 519, fn. 15 [20 L.Ed.2d at p. 783], quoting *Trop* v. *Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 642, 78 S.Ct. 590].) Thus, "a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." (391 U.S. at p. 519 [20 L.Ed.2d at p. 783], fn. omitted.)

However, the court held that a jury from which all death penalty skeptics[3] have been excluded "cannot perform the task demanded of it." (*Ibid.* [20

---

[2]Indeed, since death penalty supporters vastly outnumbered those with no opinion pro or con, a jury empanelled to determine whether to impose a death sentence consisted primarily of death penalty supporters. (See Flanagan et al., Sourcebook of Criminal Justice Statistics—1981 (U.S. Dept. of Justice, Bur. of Justice Statistics 1982) p. 209, figure 2.12 [hereinafter, *Sourcebook*].)

[3]I use the term "death penalty skeptics" to refer to those qualified jurors who have reservations about capital punishment but who cannot be excluded for cause under *Witherspoon*. (See 391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].) The term includes, for example, all those persons who have been variously described as opposing capital punish-

L.Ed.2d at p. 519].) Culled of all who harbor doubts about the wisdom of capital punishment and of all who would be reluctant to pronounce the extreme penalty, such a jury "cannot speak for the community" on the question of the appropriateness of a death sentence. (*Id.*, at p. 520 [20 L.Ed.2d at p. 783].) Instead, that jury is "deliberately tipped toward death" when compared to the community as a whole. (See *id.*, at pp. 521-522, fn. 20 [20 L.Ed.2d at pp. 784-785].)

Behind the Supreme Court's recognition that a jury culled of death penalty skeptics is biased in favor of the state lies an important principle, i.e., the constitutional requirement of jury neutrality. It is worthwhile to examine this concept closely.

The issue to be decided by a sentencing jury in a capital case is whether the defendant should live or die. Clearly, that requires a discretionary judgment by a juror. (391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) And just as clearly, a juror's preexisting attitudes toward the death penalty—whether in favor or against—are likely to influence his or her resolution of that issue. As the *Witherspoon* court stated, "a juror's general views about capital punishment play an inevitable role in any such decision." (*Ibid.* [20 L.Ed.2d at p. 783].)

A jury empanelled under the pre-*Witherspoon* system was drawn from a jury pool containing at least some, if not a majority of, supporters of capital punishment. (See *ante*, fn. 2 and accompanying text.) Death penalty supporters obviously have preconceived attitudes directly relating to the issue to be decided, and these attitudes tend to favor one of the litigants in the case, i.e., the state. Arguably, therefore, under one possible view of the concept of a neutral jury, these death penalty supporters should be excluded from capital trials in order to render the jury neutral.

However, in holding that the pre-*Witherspoon* system was biased in favor of the state, the high court did not find fault with the presence of the death penalty supporters in the jury pool. It did not rule that sentencing juries in capital cases must be composed solely of those rare persons who neither favor nor oppose the death penalty. Rather, the court held that a jury pool limited to death penalty supporters and abstainers violated due process because such a pool was *underinclusive*. What rendered the pre-*Witherspoon* system illegal was the *absence* of certain community attitudes concerning

---

ment in principle, harboring doubts or qualms or scruples concerning capital punishment, expressing general objections to capital punishment, hesitating to impose it. In *Hovey* v. *Superior Court, supra*, 28 Cal.3d 1, this group was called the "oppose death penalty" group.

the death penalty, i.e., the attitudes of those community members who opposed the death penalty but could vote for it in some cases.

The clear import of *Witherspoon*'s approach to the issue of jury neutrality is that neither death penalty skeptics nor its supporters may be said to be "biased." "If this had been the [supreme] court's concern, it would have ordered that such jurors be excluded from future capital cases." (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at p. 19.) Rather, as a careful consideration of the *Witherspoon* decision demonstrates, the Constitution requires *inclusion* of the attitudes and viewpoints which death penalty skeptics bring to a sentencing jury in a capital case. Only this reading of *Witherspoon* explains why their exclusion resulted in a "hanging jury" and a "tribunal organized to return a verdict of death." (391 U.S. at pp. 521, 523 [20 L.Ed.2d at p. 784-785]. See generally, *Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 19-21.)

*Witherspoon* remains as valid today as when it was decided. If anything, its premises and analysis have been reaffirmed and reinforced. For example, although *Witherspoon* was decided at a time when juries had unfettered discretion to choose between life imprisonment and death, it is still applicable to death penalty trials today when the jury's discretion is constitutionally required to be more circumscribed. (*Adams* v. *Texas* (1980) 448 U.S. 38, 45-47 [65 L.Ed.2d 581, 589-591, 100 S.Ct. 2521].) The *Adams* court recognized that even in the post-*Furman*[4] era, jurors still "unavoidably exercise a range of judgment and discretion" at a capital sentencing proceeding. (*Id.,* at p. 46 [65 L.Ed.2d at p. 590].) "[I]t is apparent," the *Adams* court stated, "that a . . . juror's views about the death penalty might influence the manner in which he performs his role but without exceeding the 'guided jury discretion' . . . permitted him under [state] law." (*Id.,* at pp. 46-47 [65 L.Ed.2d at p. 590], citation omitted.)

Other Supreme Court decisions have reinforced another of *Witherspoon*'s underlying premises, i.e., the notion that a sentencing jury in a capital case must "maintain a link between contemporary community values and the penal system" and "express the conscience of the community on the ultimate question of life or death." (391 U.S. at p. 519 and fn. 15 [20 L.Ed.2d at p. 783].) Indeed, in upholding capital punishment against the claim that it per se violated community standards of decency under the Eighth Amendment, the court looked to "the actions of juries . . . since *Furman.*" (*Gregg*

---

[4]*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. The *Furman* decision held that a sentencing jury may not be vested with complete and unguided discretion to impose the death penalty. (See *Beck* v. *Alabama* (1980) 447 U.S. 625, 639 [65 L.Ed.2d 392, 404, 100 S.Ct. 2382].) *Furman* effectively invalidated all existing death penalty laws in the nation.

v. *Georgia* (1976) 428 U.S. 153, 182 [49 L.Ed.2d 859, 880, 96 S.Ct. 2909] (opn. of Stewart, Powell, & Stevens, JJ.).) It explicitly relied on the linkage concept of *Witherspoon*, explaining that a jury "is a significant and reliable objective index of contemporary values because it is so directly involved." (*Id.*, at p. 181 [49 L.Ed.2d at p. 879].) Similarly, when it struck down on Eighth Amendment grounds a state law requiring a death sentence upon conviction for certain murders, the court again looked to jury decisions as one of two "crucial indicators of evolving standards of decency respecting the imposition of punishment in our society . . . ." (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 293 [49 L.Ed.2d 944, 954, 96 S.Ct. 2978] (opn. of Stewart, Powell, & Stevens, JJ.).)

Professor Winick has aptly described the continuing significance of *Witherspoon*'s "conscience of the community" premise: "Capital punishment is constitutional only on the assumption that its continued imposition does not violate the enlightened conscience of the community. For the jury to serve as the conscience of the community, it must decide cases the way the community would, and to do this, it must be fairly representative of the community." (*Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis* (1982) 81 Mich.L.Rev. 1, 82 [hereinafter, *Winick*].)

Thus, in view of *Witherspoon, Adams,* and the post-*Furman* death penalty cases, it is clear that (1) an individual on trial for his life is entitled to an unbiased sentencing jury; (2) an unbiased sentencing jury in a capital case is one that is capable of speaking for the community on the question as to whether an individual should live or die; (3) a jury is incapable of performing this role if the state excludes from the jury all who oppose or are skeptical toward the death penalty; and (4) therefore, a jury from which such persons have been excluded is a jury biased in favor of the state.

## II.

In the present case, the state has once again "swept from the jury"[5] all otherwise qualified jurors who expressed opposition to, doubts about, or hesitancy toward the death penalty.[6] The pool of jurors that the state per-

---

[5]*Witherspoon* v. *Illinois, supra*, 391 U.S. at page 520 [20 L.Ed.2d at page 784].

[6]A sampling of the voir dire indicates that several of the challenged jurors had reservations about the death penalty, although they also emphasized their ability to impose it in an appropriate case.

For example, Judith K. acknowledged that she "would hate to be put in a position to have to decide in favor of capital punishment," but believed that she could if called upon to do so. Mary K. stated that "in some cases capital punishment should be used and in some it shouldn't," but admitted that "it all depend[ed] on how serious the crime [was]." And, Mary H. believed that she would "not always . . . in every case vote against the death

mitted to serve at appellant's trial is identical to the pool of jurors allowed to serve at Mr. Witherspoon's trial. If the state's purge of death penalty skeptics "crossed the line of neutrality" in *Witherspoon (ibid* [20 L.Ed.2d at p. 784].), it is rather difficult to see why the same result is not reached here.

There is, of course, one distinction between *Witherspoon* and the present case. In *Witherspoon,* the state produced a biased jury through its use of challenges for cause; at appellant's trial, it achieved this result through the use of peremptory challenges. But this distinction is of no logical or legal significance. A jury culled of death penalty skeptics is no less biased nor more capable of speaking for the community when the culling is done by peremptory challenges rather than by challenges for cause. Under either scenario, the actual composition of the jury is the same. The jury is made up exclusively of death penalty supporters and abstainers, *but the viewpoints of death penalty skeptics are wholly excluded.* Each jury is equally incapable of expressing the conscience of the community as a whole. Each is "deliberately tipped toward death." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522, fn. 20 [20 L.Ed.2d at p. 785].)

*Witherspoon* itself did not turn on which methods the state had used to systematically exclude death penalty skeptics. The *Witherspoon* court was concerned with substance, not form, and the fact remains that a jury purged of death penalty skeptics via peremptory challenges is substantively identical to one purged via challenges for cause.

This court recognized this fact more than 15 years ago in *In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. There, a number of

---

penalty." She conceded that she was "not so strongly in favor of it," but indicated that "[e]verything would be considered," and "[i]t would depend on the situation and the seriousness of the matter."

Finally, Opal S. voiced strong feelings against the death penalty. The following colloquy is representative:

"[COUNSEL FOR CODEFENDANT SOUZA]: Are you morally and philosophically opposed to the imposition of death?

"A. As a punishment, yes.

"Q. Can you envisage any circumstance under which you could vote for such a penalty?

"A. There might be, there might be.

". . . . . . . . . . . . . . . . . . . . . . .

"[COUNSEL FOR APPELLANT]: You have indicated to the Court that with some reluctance you could impose the death penalty should we get to that phase of the trial. You understand that?

"A. Yes.

"Q. Is that your position?

"A. Yes."

In each juror's case, the prosecutor exercised a peremptory challenge shortly after these answers were given.

venirepersons had been excluded for cause in violation of *Witherspoon*'s standards. The Attorney General argued that this error was harmless, since the prosecutor would have used his remaining peremptory challenges to remove these venirepersons. (*Id.*, at p. 619.) This argument was rejected by the court since the contention was based on "a concept of an impartial jury that is in conflict with the majority opinion in *Witherspoon*." (*Id.*, at p. 620.) The court explained that "a jury from which all prospective jurors opposed [to] the death penalty have been excluded is not an impartial jury but rather constitutes a 'hanging jury' . . . ." (*Ibid.*)

Not even *Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824] would support the prosecutor's actions in peremptorily excluding all death penalty skeptics.[7] In *Swain,* a black defendant was convicted and sentenced to death by an all-white jury after the prosecution had struck each of the six blacks on the venire by the equivalent of peremptory challenges. (See *People* v. *Wheeler, supra,* 22 Cal.3d at p. 283.) On appeal, the defendant claimed that the prosecution's use of its peremptory challenges violated the federal Constitution's prohibition of intentional discrimination against blacks. (*Swain* v. *Alabama, supra,* 380 U.S. at pp. 203-205 [13 L.Ed.2d at pp. 763-764].) The court rejected this contention, out of an apparent desire to avoid "a radical change in the nature and operation of the [peremptory] challenge." (*Id.*, at pp. 221-222 [13 L.Ed.2d at p. 773].) Noting the long established purpose and functions of such challenges, the high court reasoned that if it agreed with defendant's argument, a peremptory challenge "would no longer be peremptory, each and every challenge being open to examination . . . ." (*Id.*, at p. 222 [13 L.Ed.2d at p. 773].)

In *Swain,* a contention involving federal cross-sectional principles was considered. At that time, these principles grew exclusively out of the equal protection clause but they were subsequently incorporated into the Sixth Amendment. (See *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692]; see also *People* v. *Wheeler, supra,* 22 Cal.3d at p. 270, fn. 8 and accompanying text.) While *Swain*'s holding may have survived this relocation to the Sixth Amendment,[8] its cross-sectional approach is dis-

---

[7]I say "not even *Swain,*" because the representative cross-section requirement of the California Constitution imposes more limits on the prosecutor's use of peremptory challenges than are required by *Swain*'s interpretation of the federal equal protection clause. (See *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].)

As I shall discuss shortly, even under the federal Constitution, *Swain* does not authorize the prosecutor's actions in this case, because *Swain* was based on constitutional principles quite different from those applied in *Witherspoon.*

[8]See *People* v. *Wheeler, supra,* 22 Cal.3d at pages 284-285.

It is arguable that *Swain* did not survive. The old equal protection analysis, under which *Swain* was decided, required a showing of "purposeful or deliberate" or "intentional" discrimination against blacks. (380 U.S. at pp. 203-204, 205 [13 L.Ed.2d at pp. 763-764].)

tinct from, though related to, the due process analysis of *Witherspoon*. (See *People* v. *Fields* (1983) 35 Cal.3d 329, 342 [197 Cal.Rptr. 803, 673 P.2d 680].) The defendant in *Swain* did not claim that the jury resulting from the prosecutor's peremptory challenges was a *biased* jury, and nothing in the *Swain* decision authorizes the state to utilize its challenges to obtain a jury that has been demonstrated to be biased. Indeed, the *Swain* court premised its holding on the salutary purposes of the challenge—to eliminate or reduce the risk of partiality[9]—and it has never been a purpose of peremptory challenges to entitle a litigant to obtain a jury slanted in his favor.

In summary, the state stacked the deck against the appellant in the present case and obtained a hanging jury. That is strictly forbidden under the principles set forth in *Witherspoon*. Nothing—not even *Swain* v. *Alabama*—permits a court to uphold a death sentence imposed by a jury organized to return a verdict of death.

## III.

There is another way in which the prosecutor's use of peremptory challenges to remove all death penalty skeptics countermands the requirements of *Witherspoon*. For a sentencing jury to "express the conscience of the community on the ultimate question of life or death" as required by *Witherspoon* (391 U.S. at p. 519 [20 L.Ed.2d at p. 783], fn. omitted), it must be fairly representative of the community. (See *Winick, op. cit. supra,* 81 Mich.L.Rev. at p. 82.)

Blacks and women are, of course, members of the community whose conscience is to be expressed. They are also disproportionately likely to be opposed to capital punishment. Thus, to permit the exclusion of all death penalty skeptics by peremptory challenge is to promote the significant underrepresentation of these groups on capital juries.

It is undeniable that the proportion of blacks and women on capital case juries will suffer if all death penalty opponents may be removed by the

Arguably, it was this requirement of intent—and the perceived difficulties with inferring discriminatory purpose from a state officer's actions at a single trial—that led the *Swain* court to impose strict limits on defense attacks on the prosecution's use of peremptory challenges. (*Id.,* at pp. 222, 223 [13 L.Ed.2d at pp. 773-774].)

However, a showing of intent to discriminate is no longer required under the cross-section requirement. (See *Duren* v. *Missouri* (1979) 439 U.S. 357, 368, fn. 26 [58 L.Ed.2d 579, 589, 99 S.Ct. 664].) It is, therefore, quite possible that *Swain* is no longer viable in light of the more recent Sixth Amendment cases. (See *McCray* v. *New York* (1983) 461 U.S. 961, [77 L.Ed.2d 1322, 103 S.Ct. 2438, 2439] [memo. opn. of Stevens, J. on den. cert.], 461 U.S. 961, [77 L.Ed.2d 1322, 103 S.Ct. 2438, 2439] [dis. opn. of Marshall, J. on den. cert.]; see also *Gilliard* v. *Mississippi* (1983) 464 U.S. 867, 868 [78 L.Ed.2d 179, 104 S.Ct. 40, 40] [dis. opn. of Marshall, J. on den. cert.].)

[9]380 U.S. at pages 220-221 [13 L.Ed.2d at pages 772-773].

prosecution. In *Hovey* v. *Superior Court, supra,* 28 Cal.3d at pages 54-56, this court found that women have consistently opposed the death penalty in greater numbers than men. Over the 25-year period from 1953 to 1978, an average of 11 percent more women than men expressed opposition to the death penalty. (*Id.,* at p. 54.)

The disparity between whites and blacks exceeds that between men and women. (*Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 56-57.) Over the same 25-year period, an average of 23 percent more whites favored the death penalty than blacks. (*Id.,* at p. 56.) And the gap was increasing over time: by 1978, 73 percent of whites but only 46 percent of blacks favored the death penalty. (*Ibid.*)

From the evidence presented in *Hovey,* it is possible to obtain some quantitative indication of the impact of the prosecutor's use of peremptory challenges to remove all death penalty skeptics. During the years 1953 through 1978, an average of about 44 percent of women and 33 percent of the men opposed the death penalty. Thus, if all death penalty opponents are excluded from a jury pool, women will be excluded proportionally more often than men: 44 percent of all women will be removed, as opposed to only 33 percent of men.[10]

The situation is worse for blacks. During the 25-year period in question, an average of approximately 57 percent of blacks opposed the death penalty, as compared with 37 percent of whites. As a result, the exclusion of all death penalty opponents would result in the exclusion of more than half of all blacks but only about one-third of whites.

I recognize that some underrepresentation of women and blacks on capital sentencing juries is unavoidable, since the views of women and blacks regarding the death penalty make them more prone to being excluded for cause than men and whites, respectively. (See *Hovey* v. *Superior Court, supra,* 28 Cal.3d at pp. 55-56 [women], 57 [blacks].) However, the fact that a certain degree of underrepresentation is inevitable makes it all the more imperative that the proportion of women and blacks not be diluted

---

[10]These figures were derived from charts in *Hovey* which, in turn, were based on the results of nationwide polls. The data displayed in the charts does not include the responses of those persons who stated they did not know whether they favored the death penalty. (See 28 Cal.3d at pp. 55, 56.) If it is conservatively assumed that prosecutors would not peremptorily challenge any of such persons, the figures I have set forth would overstate somewhat the percentages of persons removed from the jury due to their death penalty views. The disparity is not likely to be substantial, however. (See *ante,* fn. 2.)

My figures differ slightly from those reported by the petitioner in *Hovey,* since I have calculated averages using figures for each of the 25 years, not merely those years in which a poll was taken.

further. This would seem to be a particularly compelling concern in capital cases, where the issue is literally life or death. And it should be an even greater imperative where one of the underrepresented groups is also the group that has traditionally been singled out in disproportionate numbers to receive death sentences.

## IV.

There is still another way in which the use of peremptories to excuse death penalty skeptics violates the Constitution. Such a procedure contravenes the Eighth Amendment's requirement that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." (*Gardner* v. *Florida* (1977) 430 U.S. 349, 357-358 [51 L.Ed.2d 393, 402, 97 S.Ct. 1197].)[11] Time and again the Supreme Court has stressed that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." (*Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989, 98 S.Ct. 2954] (plurality opn.); *Woodson* v. *North Carolina, supra,* 428 U.S. at p. 305 [49 L.Ed.2d at p. 961] (plurality opn.).)

This "reliability" principle has moved the court to hold, for example, that a sentencer cannot be precluded from considering, "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990], fn. & italics omitted.) A statute which precludes such consideration "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." (*Id.,* at p. 605 [57 L.Ed.2d at p. 990].)

Similarly, the court has held that a statutory prohibition on lesser included homicide instructions in the guilt phase of a capital case violates due process. (*Beck* v. *Alabama, supra,* 447 U.S. 625.) Using the "reliability" principle, the *Beck* court found that the unavailability of such instructions "encourage[d] the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished."

---

[11]Justice O'Connor recently explained the Supreme Court's concern in this area by noting that the court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 118 [71 L.Ed.2d 1, 13, 102 S.Ct. 869] (conc. opn. of O'Connor, J.).)

(*Id.*, at p. 642 [65 L.Ed.2d at p. 406].) Since that possibility "introduce[d] a level of uncertainty and unreliability into the factfinding process" it could not "be tolerated in a capital case." (*Id.*, at p. 643 [65 L.Ed.2d at p. 406].)

Obviously, the state's "heightened interest" in the reliability of capital judgments also plays a major role in assessing the fairness of a state's jury selection procedures.[12] It is no wonder, then, that *Witherspoon* requires a capital jury that "express[es] the conscience of the community on the ultimate question of life or death." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 519 [20 L.Ed.2d at p. 783].) When a capital jury fails to maintain "a link between contemporary community values and the penal system," its determination does not "reflect 'the evolving standards of decency that mark the progress of a maturing society.'" (*Id.*, at p. 519, fn. 15 [20 L.Ed.2d at p. 783], quoting *Trop* v. *Dulles, supra,* 356 U.S. at p. 101 [2 L.Ed.2d at p. 642].) The result is a death sentence predicated less on the evidence and reason, and more on "whim, passion, prejudice or mistake." (*Eddings* v. *Oklahoma, supra,* 455 U.S. at p. 118 [71 L.Ed.2d at p. 13] (conc. opn. of O'Connor, J.); see *Swain* v. *Alabama, supra,* 380 U.S. at p. 220 [13 L.Ed.2d at p. 772].)

For this reason, concerns about reliability in jury selection procedures are as fundamental to the Eighth Amendment as concerns that the state permit the sentencer access to individualized information about the accused. (See *Gillers, op. cit. supra,* 129 U.Pa. L.Rev. at p. 86; *Winick, op. cit. supra,* 81 Mich.L.Rev. at pp. 78-82; see also Haney, *Epilogue: Evolving Standards and the Capital Jury* (1984) 8 Law & Human Behav. 153, 157.)

Obviously, in order to serve as "a significant and reliable objective index of contemporary values" (*Gregg* v. *Georgia, supra,* 428 U.S. at p. 181 [49 L.Ed.2d at p. 879] (plurality opn.)), a capital jury must not be purged of a significant segment of community attitudes. *Witherspoon* permits but one exception to this rule. It sanctions the removal of jurors who would never vote to impose a death sentence regardless of the evidence in the case before them. This limited exception fully satisfies the state's interest in removing from the jury those who would nullify a state's statutory scheme. (*Winick, op. cit. supra,* 81 Mich.L.Rev. at p. 44.)

To permit further exceptions heightens the probability that a capital jury's sentence will not enjoy the reliability that recent United States Supreme Court pronouncements find essential. Yet, that is precisely the effect of

---

[12]As Professor Gillers observes, reliability "is a function not only of the information provided the sentencer but of the identity of the sentencer as well . . . ." (Gillers, *Deciding Who Dies* (1980) 129 U.Pa. L.Rev. 1, 86 [hereafter *Gillers*].)

permitting the wholesale removal of death penalty skeptics by peremptory challenge.

In spite of these compelling considerations, a plurality of this court see no problem with the state's use of peremptory challenges to exclude all death penalty skeptics from a capital case jury. (See lead opn., *ante,* at pp. 313-315.) With all due respect, I must demur.

## V.

By inference, the plurality argue that death penalty skeptics are not a cognizable class and that their exclusion does not violate the representative cross-section requirement.[13] Initially, even if this were correct, it is irrelevant. The cognizable class requirement is an element of the representative cross-section mandate of the Sixth Amendment to the federal Constitution, as well as article I, section 16 of the California Constitution. (See *Taylor* v. *Louisiana, supra,* 419 U.S. 522; *People* v. *Wheeler, supra,* 22 Cal.3d 258.)

As this court has carefully explained,[14] *Witherspoon* was *not* a "representative cross-section" case. It was based on due process principles, i.e., "basic requirements of procedural fairness." (391 U.S. at p. 521, fn. 20 [20 L.Ed.2d at p. 784]; see also *id.,* at p. 523 [20 L.Ed.2d at pp. 785-786].)[15] These principles prohibit judicial proceedings before a biased tribunal. It is irrelevant whether or not the bias involves cognizable classes.

Both the representative cross-section analysis and *Witherspoon*'s due process approach attempt ultimately to ensure a neutral jury. (See *Hovey* v. *Superior Court, supra,* 28 Cal.3d at p. 20, fn. 45.) However, whereas bias—or risk of bias—must be *demonstrated* under the due process analysis, it is presumed under the representative cross-section approach. Under a cross-section analysis, the systematic exclusion of cognizable classes—but

---

[13]The plurality fail to explicitly advance this argument. However, it is implicit in their discussion of *People* v. *Wheeler, supra,* 22 Cal.3d 258, which they view as having "merely condemned the use of peremptory challenges to indulge so-called 'group bias'—the *presumption* that persons are biased 'because they are members of an identifiable group distinguished on *racial, religious, ethnic, or similar* grounds . . . .'" (Lead opn., *ante,* at p. 315, quoting *People* v. *Wheeler, supra,* 22 Cal.3d at p. 276, italics theirs.) Presumably, this passage is strong evidence that the plurality agree with the premise that death penalty skeptics do not constitute a "group"—or constitutionally cognizable class—to which the *Wheeler* holding would apply.

[14]*Hovey* v. *Superior Court, supra,* 28 Cal.3d at pages 10-11, footnote 17, pages 17-18, footnote 38, page 20, footnote 45.

[15]I believe that these same principles are embodied in the due process clause of the California Constitution, in addition to and independent of the federal Constitution.

*only* cognizable classes—is prohibited. However, *any* systematic exclusionary policy—even one not involving constitutionally cognizable groups—can be struck down under due process principles, if it has been demonstrated to result in a biased tribunal.

Therefore, the fact that an exclusionary practice of the state might not affect a cognizable class means *only* that the practice does not violate representative cross-section principles. It does *not* mean that the exclusion necessarily comports with due process.[16] Today's plurality opinion appears to have overlooked this important fact.

Even viewing the issue as cross-sectional, there are serious flaws in the reasoning which would hold such a class not cognizable on the basis that the viewpoints of the death penalty skeptics are too diverse.[17] I recognize that in *People* v. *Fields, supra,* 35 Cal.3d at pages 342-350, three members of this court held that persons who would never vote for a death sentence, but who could be fair and impartial on the issue of guilt, do not comprise a constitutionally cognizable class for purposes of the guilt phase of a capital trial.[18] Even if full credence were given to that argument, the exclusion of death penalty skeptics in the present case cannot be sustained. There is a critical difference between the two cases.

First, death penalty skeptics are likely to be an even larger group than guilt phase includables. Under cross-sectional principles heretofore articulated by the courts, the greater the size of a group the more it weighs in *favor* of cognizability, not against it. In discussing the test for what constitutes such a class, the courts have tended to talk about the need to include " 'any large and identifiable segment of the community' " and any " 'substantial and identifiable class of citizens.' " (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 269, quoting from *Peters* v. *Kiff* (1972) 407 U.S. 493, 503 [33 L.Ed.2d 83, 94, 92 S.Ct. 2163] (plur. opn.).)

---

[16]An example may further illustrate this point. Suppose a prosecutor in a small county or judicial district were able to use his peremptory challenges to exclude from the jury pool all persons who were unrelated to or unacquainted with a crime victim. As a result, the jury panel would consist of relatives and friends of the victim. The excluded group obviously is not a "cognizable class," so no cross-section violation has occurred. But just as obviously, the jury would be unconstitutional under due process principles because it is not neutral. This is precisely the kind of jury that was produced here—a jury that the Supreme Court has already determined to be biased.

[17]The Attorney General has advanced such an argument in this case.

[18]The *Fields* plurality argued that this group—the "guilt phase includables"—was "united only by their determination to vote automatically against the death penalty" and have "diverse views on all other matters." (*Id.,* at p. 349.) The guilt phase includables harbor stronger and more uncompromising views against capital punishment than do death penalty skeptics. (See *People* v. *Fields, id.,* at pp. 348-349, fn. 5.)

More importantly, the "diversity" argument fails to recognize that diversity is not what determines its cognizability or lack thereof. Blacks, women, and Mexican-Americans are highly diverse groups in many respects, yet all are constitutionally cognizable. What makes each of these groups cognizable are not the characteristics, viewpoints, and attitudes which the groups tend to share with the rest of society, but those which distinguish it from the population at large. Each of these groups is cognizable, in large part, because it tends to bring to the jury room certain viewpoints and attitudes which are relevant to the tasks juries are asked to perform and which otherwise would go unrepresented or underrepresented.

The proper focus should be on what the death penalty skeptics would add to the functioning of a capital case jury. Even assuming that death penalty skeptics were identical to all other jurors in all other respects, they nevertheless bring their unique and otherwise unrepresented viewpoints concerning the death penalty. Moreover, unlike the situation in *Fields,* this is an important addition to the jury, since these viewpoints are directly relevant to an issue which the jury is required to decide.

It may be useful to elaborate. *Fields* dealt with the exclusion of the guilt phase includables from the *guilt* phase of a capital trial. The present case involves the exclusion of the death penalty skeptics from the *penalty* phase. This is a crucial difference. *Fields* upheld the exclusion of the guilt phase includables from the guilt phase because in all matters *except* their death penalty views, this group was the same as the remaining jurors. Inasmuch as an individual's views on penalty are technically irrelevant to a jury's functioning at the guilt phase, the exclusion of persons harboring distinctive views *only* as to penalty would not alter the guilt phase performance of a jury from which they had been excluded.

The situation is drastically different in the present appeal. The issue in this case, unlike *Fields,* involves the penalty phase of a capital trial. Unlike *Fields,* it involves the exclusion of viewpoints that "play an inevitable role" in the decision on the ultimate issue in that phase of the trial, i.e., "whether or not death is 'the proper penalty' in [the] case . . . ." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 519 [20 L.Ed.2d at p. 783], italics deleted.) In this situation, to exclude all persons with reservations about the death penalty is to thwart the very purpose of the cross-section requirement. "[T]he goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community attitudes . . . ." (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 98 [154 Cal.Rptr. 734, 593 P.2d 595], italics deleted (lead opn. of Mosk, J.).) Without the death penalty

skeptics, virtually one-half of all attitudes relevant to the very issue to be decided will go entirely unrepresented.[19]

Finally, even if one were to accept the conclusion that the death penalty skeptics are not themselves constitutionally cognizable, that would not end the cross-section inquiry. Constitutional cross-section principles forbid not merely those systematic exclusions that are aimed at cognizable classes but also those which "lead to" or "result in" the exclusion of cognizable classes. (See, e.g., *People* v. *Harris* (1984) 36 Cal.3d 36, 45, 52, 56-57 [201 Cal.Rptr. 782, 679 P.2d 433].)

It is well established that blacks and women are constitutionally cognizable classes. It is also clear, as I have already pointed out, that the exclusion of all death penalty skeptics will result in the significant underrepresentation of blacks and women on capital sentencing juries. Today's plurality opinion *does not even attempt to address this cross-section problem.*

The plurality also sanction the use of peremptory challenges to remove all death penalty skeptics from capital juries on the basis that such persons allegedly have "specific juror attitudes on the death penalty." (Lead opn., *ante,* at p. 315.) May I respectfully suggest that this contention has not been carefully thought out.

If all death penalty skeptics have a "specific attitude" which entitles the prosecutor to remove them from death penalty cases, it is difficult to understand why the Supreme Court forbade their exclusion in *Witherspoon.* Why are they not excludable for cause? Did *Witherspoon* command that biased jurors be permitted to serve on capital cases?[20]

The answer should be obvious. The jury which had imposed a death sentence on Mr. Witherspoon was biased because of the *absence* of the views of the death penalty skeptics. Their inclusion was constitutionally required in order to prevent the jury from being a hanging jury. To permit these same jurors to be excluded once again for alleged "bias" is to restore the

---

[19]Of course, the state may choose to exclude from a sentencing jury those venirepersons who make unmistakably clear that they would never vote to impose death. (See *Witherspoon* v. *Illinois, supra,* 391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].) The state has a significant interest in ensuring that a sentencing jury is capable of making a decision based on the evidence. (See *Hovey* v. *Superior Court, supra,* 28 Cal.3d at p. 21, fn. 51.) No such interests are implicated in the present case. (See *Adams* v. *Texas, supra,* 448 U.S. at p. 44 [65 L.Ed.2d at p. 589].)

[20]The plurality attempt to downplay this unconstitutional result by characterizing death penalty skeptics' views as "leanings," "strong opinions," and "attitudes." (Lead opn., *ante,* at p. 315.) Such terms cannot mask the fact that it is precisely because of these jurors' *biases* on the death penalty that the prosecutor exercised her peremptory challenges.

jury to its former status as a hanging jury. This result clearly violates due process. The reasoning by which that result is reached is flatly inconsistent with *Witherspoon*'s view of what constitutes a neutral penalty jury, as this court recognized in *In re Anderson, supra,* 69 Cal.2d at page 620.

The fact is that death penalty skeptics are not biased in a constitutionally recognized way. They, like all other jurors allowed to serve, would impose death in a "proper" case, although they may differ as to what a "proper" case is. But that is the very reason their presence is constitutionally required, i.e., to ensure that a decision to impose death is made by a jury whose views regarding a "proper" case will reflect—as closely as the process of random draw allows—the views of the community at large. (See *People* v. *Wheeler, supra,* 22 Cal.3d at p. 277.) This cannot be done if one end of the "proper case" spectrum is swept away at the state's whim. Instead of serving as a "significant and reliable objective index of contemporary values,"[21] death sentences by such juries will reflect a "distorted exaggeration of the community's willingness to impose the death penalty."[22]

This practice has been expressly refuted by the United States Supreme Court. In *Adams* v. *Texas, supra,* 448 U.S. 38, the court held that even when death penalty skeptics "frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt," they may not constitutionally be excluded from the jury. (*Id.,* at p. 50 [65 L.Ed.2d at p. 593].) "Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law." (*Ibid.* [65 L.Ed.2d at p. 593].) Obviously, this holding is wholly inconsistent with today's rule permitting such jurors to be excluded for bias.

There is a further problem with the premise that death penalty skeptics may be peremptorily excused for bias. I have no quarrel whatsoever with the proposition that a peremptory challenge may be exercised on the basis of evidentiary subtleties that would be insufficient to sustain a challenge for cause. But that was not the case here. As the transcript of the voir dire makes clear, several of the excluded jurors *were* death penalty skeptics. (See *ante,* fn. 6.) Here, the state's peremptory challenges to those jurors

---

[21] *Gregg* v. *Georgia, supra,* 428 U.S. at page 181 [49 L.Ed.2d at page 879].

[22] *Winick, op. cit. supra,* 81 Mich.L.Rev. at page 81.

were exercised on legal reasoning which could never serve as a basis for a challenge for cause.

This court's landmark decision in *People* v. *Wheeler, supra,* 22 Cal.3d 258, demonstrates the distinction between evidentiary and legal bases for challenges for cause. *Wheeler* did not alter the rule that an evidentiary showing was unnecessary to sustain a peremptory challenge. It did, however, require that there be some valid legal reasoning underlying the peremptory challenge. As the court specifically noted, while "no reason need be given" for the exercise of a peremptory challenge, "it does not follow therefrom that it is an objection for which no reason need *exist..*" (*Id.,* at p. 274.) For that reason, there are only certain "kinds of bias upon which the [peremptory] challenge may permissibly be based."[23] (*Id.,* at p. 275.)

If—as *Witherspoon* holds—the Constitution forbids the state from excusing a class of jurors for cause based on their death penalty views, what suddenly transforms those same views into the "kind[] of bias upon which [a peremptory] challenge may permissibly be based"? The plurality do not begin to address, let alone answer, this question. They appear to assume that any reasoning may serve as the basis for the exercise of a peremptory challenge, even if it is a constitutionally impermissible ground for a challenge for cause. But that assumption has no support in the law. It does not survive even a cursory reading of the *Wheeler* decision. *Wheeler* is the only instance where this court has previously addressed such a problem. Significantly, this court refused to permit a peremptory challenge to be exercised on the basis of the "kind of bias" which could never constitutionally serve as a challenge for cause.

I am not suggesting here that no death penalty skeptic may ever be peremptorily challenged. As in the *Wheeler* context, it may well be that some individual death penalty skeptics may be excused if there is other evidence suggestive of partiality. But that is not what was involved in this case, nor does the plurality opinion so limit the practice.

The plurality's conclusion that the prosecution may use peremptories to excuse death penalty skeptics is also based on the premise that both the prosecution and defense have "equal [and] limited numbers of peremptory challenges . . . ." (Lead opn., *ante,* at p. 315; see Pen. Code, § 1070.[24])

---

[23]Even *Swain* v. *Alabama, supra,* 380 U.S. at page 223 [13 L.Ed.2d at page 774], indicated that the permissible grounds for the exercise of peremptory challenges were limited to "acceptable considerations related to the case."

[24]Penal Code section 1070, subdivision (a) provides in part that where the offense carries a maximum penalty of life imprisonment or death, "the defendant is entitled to 26 and the state to 26 peremptory challenges."

The force of this fact, the plurality presumably reason, is that this "equal opportunity" "cures" any imbalance that results from the state's use of peremptories to achieve a biased jury. While the plurality's abstract reading of the Penal Code is correct, their reliance on it in the present context is severely flawed.

In *People* v. *Wheeler, supra,* 22 Cal.3d 258, this court forbade prosecutors from using peremptory challenges to remove blacks for group bias. Significantly, the court did not find that the existence of "equal and limited" numbers of such challenges—which would enable the defense to get blacks onto a jury by using its peremptory challenges against whites—remedied the problem.[25] What today's plurality appear to have done is to permit an evisceration of the principles on which *Wheeler* was based.

One very good reason why the *Wheeler* court would have been ill advised to accept this line of reasoning is that it will not work in the real world. Whites significantly outnumber blacks in this state. Thus, to have a realistic chance of maintaining the proper proportion of blacks to whites, the defense will have to challenge several whites for each black peremptorily excused by the prosecution. To borrow the words of the Red Queen to Alice, it will "take[] all the running you can do, to keep in the same place."[26] Even at this pace, the effort is doomed to fail. Since the prosecution's number of peremptory challenges equals that of the defense, the proper proportion of blacks can be maintained only for a limited time.

This reasoning is equally impractical in the present context. A conservative estimate would place the ratio of death penalty supporters to skeptics at four-to-one,[27] so that the defense would have to remove four supporters

[25] I also question whether the premise of this argument is good policy. Do the plurality truly desire to encourage a litigant—here, the defense—to exercise peremptory challenges for no reason other than to make up for the opposing party's use of peremptory challenges? Yet, that is the implication of the plurality opinion.

[26] Carroll, Through the Looking-Glass (1872) chapter II.

[27] If the result of the most recent statewide vote concerning the death penalty is any indication, supporters of the death penalty outnumber opponents by about three-to-one. (Cal. Sec. of State, Statement of Vote - Nov. 7, 1978, Gen. Election, p. 39.) This figure is in rough agreement with the most recent national statistics. (*Sourcebook, op. cit. supra,* at p. 212, Table 2.37.)

Not all opponents of the death penalty would survive a challenge for cause. According to Professor Winick, public opinion polls show that between one-half and two-thirds of death penalty opponents would be excludable for cause. (*Winick, op. cit. supra,* 81 Mich.L.Rev. at p. 76, fn. 302.) This means that no more than one-half of the death penalty opponents would be classified as death penalty skeptics. These figures would place the ratio of death penalty supporters to skeptics at between six-to-one and nine-to-one.

Of course, some death penalty supporters will be removable for cause as well, but that number will be small. (See *Adams* v. *Texas, supra,* 448 U.S. at p. 49 [65 L.Ed.2d at p. 592].) It most certainly will not approach the percentage of death penalty opponents who are excludable for cause.

Thus, I conservatively estimate there are four qualified death penalty supporters for every death penalty skeptic.

to every one death penalty skeptic peremptorily removed by the prosecution. If only 5 death penalty skeptics were thus excused, the defense would have to use 20 of its 26 challenges to keep any balance. And if any more such jurors happen to appear thereafter, the prosecutor would have 21 challenges left with which to remove them. It is of little comfort to the defense that the prosecutor is "limited" to 26 such challenges, since that number is probably more than sufficient to remove all of the death penalty skeptics from a given panel. In short, a minority viewpoint simply cannot be maintained on the premise that both sides have an "equal and limited" number of peremptory challenges.

Not only is this premise impractical in the real world, it is extremely unfair. For while the defense must use up a disproportionate amount of its challenges in an attempt to keep the penalty phase jury unbiased, the prosecution is free to use the majority of its challenges to tailor the jury to its liking as to *guilt.* The defense, but not the prosecution, is forced to choose between using its peremptory challenges to obtain a fair penalty jury or a fair guilt jury.

There is another way in which this reasoning is unrealistic. It assumes that current death-qualifying voir dire procedures are as likely to reveal the death penalty supporters as death penalty skeptics. I suggest, however, that this is not the case. In fact, a far greater percentage of death penalty skeptics identify themselves at voir dire than do death penalty supporters. Review of the voir dire transcripts of automatic appeals decided by this court confirms the existence of the problem.

Although death penalty supporters vastly outnumber opponents, it is a rare voir dire transcript where more venirepersons acknowledge support for capital punishment than opposition. Consequently, unless we begin to allow venirepersons to be questioned about their general views on capital punishment—an innovation I, for one, would not welcome—the individual on trial will continue to have difficulty identifying those death penalty supporters he should peremptorily challenge in order to maintain a properly balanced penalty jury.

### VI.

A jury from which all death penalty skeptics have been excluded is a jury "organized to return a verdict of death." (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 521 [20 L.Ed.2d at p. 784].) It is a jury that substantially underrepresents blacks and women. And it is, therefore, a jury which has specifically been condemned by the United States Supreme Court for it violates one of the "basic requirements of procedural fairness." (*Id.,* at

p. 521, fn. 20 [20 L.Ed.2d at p. 784].) It "cannot speak for the community" and hence "cannot perform the task demanded of it" (*id.*, at pp. 519, 520 [20 L.Ed.2d at p. 783]), and its verdict is less reliable.

The only death penalty opponents who may be excluded from a capital trial on the basis of their views concerning the death penalty are those who can never vote to impose death in any case or who cannot be fair and impartial on guilt. (*Id.*, at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].) "[T]o exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible." (*Adams* v. *Texas, supra,* 448 U.S. at p. 49 [65 L.Ed.2d at p. 592].)

The plurality today continue to sanction the wholesale removal of death penalty skeptics on "broader grounds" than those permitted by *Witherspoon* and *Adams.* They continue to permit the selection of a jury which is identical in composition to the jury which was condemned in *Witherspoon.* A hanging jury by any other name is still a hanging jury.

One would think that at least a prima facie due process violation has been established here. The burden should shift to the state to justify its use of a jury "deliberately tipped toward death." (See *Witherspoon* v. *Illinois, supra,* 391 U.S. at pp. 521-522, fn. 20 [20 L.Ed.2d at p. 785].) Not a hint of a legitimate state interest has been offered to justify this trial by a biased jury. Further, it is doubtful any can be conjured up, since *Witherspoon* itself was "designed to accommodate the State's legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." (*Adams* v. *Texas, supra,* 448 U.S. at p. 44 [65 L.Ed.2d at p. 589].)

What the plurality have done today is to countenance a wholesale subversion of *Witherspoon* and fundamental principles of due process. Indeed, if a somewhat broader overview of this case is taken, the vista is truly bewildering. Recently, in *People* v. *Fields, supra,* 35 Cal.3d 329, a plurality of this court refused to permit certain death penalty opponents to serve at the guilt phase of a capital trial, even though those jurors swore they could be fair and impartial. The *Fields* plurality based its decision, in large part, on speculation that such jurors might be biased against the prosecution. (*Id.*, at pp. 351-352.) In the present case, the plurality must know for certain— since *Witherspoon* explicitly so holds—that a jury culled of death penalty skeptics is a biased jury, albeit in *favor* of the prosecution. Yet, this jury is valid. It is impossible to satisfactorily reconcile the decision in this case with *Fields.*

The prosecutorial peremptory challenge practices utilized in this case produce juries that do not reflect the conscience of the community. Such juries

are also disproportionately white and male. Purged of all persons who express any skepticism or reluctance concerning the death penalty, such juries produce verdicts that are "a distorted exaggeration of the community's willingness to impose the death penalty." (*Winick, op. cit. supra*, 81 Mich.L.Rev. at p. 81.) Like the Supreme Court in *Witherspoon*, I would forbid a death sentence to be imposed by a hanging jury.

Reynoso, J., concurred.

**MOSK, J.,** Concurring and Dissenting.— I concur in the plurality's disposition of this appeal insofar as it affirms the judgment as to guilt, sets aside the special circumstances findings, and reverses the judgment as to penalty.

I dissent from Part II.2.a of the plurality opinion (*ante,* pp. 313-315) insofar as it purports to answer the question we expressly left open in *People v. Zimmerman* (1984) 36 Cal.3d 154, 161, footnote 6 [202 Cal.Rptr. 826, 680 P.2d 776], i.e., whether "the use of peremptory challenges to systematically exclude persons who had reservations about the death penalty" denies a capital defendant "his due process right to a 'neutral' or impartial penalty phase jury within the meaning of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 . . . ." I disagree with the plurality's answer to that question for the reasons stated in Parts I, II, and V (except pp. 342-344, *ante*) of the concurring and dissenting opinion by the Chief Justice in this case.

Respondent's petition for a rehearing was denied January 17, 1985. Bird, C. J., and Lucas, J., were of the opinion that the petition should be granted.